UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

IN RE: U.S. INSURANCE GROUP, LLC        )
                                        )        No. 1:10-cv-17
RICHARD P. JAHN, JR., TRUSTEE           )        *Edgar*
    *Appellant,*                           )
                                        )
                                        )
*v.*                                    )
                                        )
COHUTTA BANKING COMPANY,                )
    *Defendant*                            )
                                        )
                                        )
BANK DIRECT FINANCE COMPANY             )
    *Defendant*                            )
                                        )
                                        )
CORNERSTONE COMMUNITY BANK              )
    *Appellee*                             )
_____ )
                                        )
IN RE: U.S. INSURANCE GROUP, LLC,       )        No.  1:10-cv-27
                                        )        *Edgar*
RICHARD P. JAHN, JR., TRUSTEE           )
    *Plaintiff*                            )
                                        )
*v.*                                    )
                                        )
COHUTTA BANKING COMPANY                 )
    *Appellant*                            )
                                        )
BANK DIRECT FINANCE COMPANY             )
    *Defendant,*                           )
                                        )
CORNERSTONE COMMUNITY BANK              )
    *Appellee.*                            )

# MEMORANDUM

These cases constitute a consolidated appeal from a final decision by the United States Bankruptcy Court. Appellants Trustee, Richard P. Jahn ("Trustee") and Cohutta Banking Company ("Cohutta") (collectively "Appellants") bring these appeals pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001. *See* Case Nos. 1:10cv17, 1:10cv27. Because these cases represent the same issues involving the same parties, the court will address them in one memorandum. The Appellants appeal from the Bankruptcy Court's award of summary judgment *sua sponte* to Appellee Cornerstone Community Bank ("Cornerstone") regarding Cornerstone's priority in a secured interest in U.S. Insurance Group, LLC's ("USIG") book of business and insurance commissions. After reviewing the record, the Court concludes that the Bankruptcy Court's decision is correct, and it will be **AFFIRMED**. The Court will **DISMISS** the appeals by Appellants.

## II. Statement of Issues

Appellant Trustee asserts the following issues to be determined by this court on appeal:

1. Did the Bankruptcy Court err as a matter of law in failing to hold that U.S. Insurance Group's book of business should be classified for UCC purposes as a "general intangible"?

2. Did the Bankruptcy Court err as a matter of law in denying Plaintiff's Motion for Partial Summary Judgment and holding that Cornerstone Community Bank's description of the collateral was sufficient to perfect a lien against U.S. Insurance Group's book of business?

3. Did the Bankruptcy Court err as a matter of law in granting summary judgment to Cornerstone Community Bank and holding that it had a security interest in U.S. Insurance

Group's book of business superior to the security interest of Cohutta Banking Company?

*See* [Case No. 1:10cv17, Court Doc. No. 1-1].

## I. Background and Facts

The material facts in this case are largely undisputed. USIG initiated a voluntary bankruptcy proceeding pursuant to Chapter 11 on April 29, 2009. [Case No. 1:10cv17, Court Doc. No. 1-4, Amended Bankruptcy Complaint]. The Amended Bankruptcy Complaint asserts the following events transpired relating to USIG's bankruptcy proceeding:

> By Order entered May 19, 2009, this Court approved the sale of the Debtor's book of business consisting of customer files, renewals, expirations and records relating thereto including a quitclaim of the covenants not to compete with various employees to the extent of the Debtor's interest therein.
>
> Cornerstone Community Bank is a bank with its principal place of business in Hamilton County, Tennessee and as a result of various financing statements recorded with the Secretary of State for the State of Tennessee has or may assert a security interest against the assets sold by order of this Court. Attached hereto as Exhibit 1 are the financing statements recorded by Cornerstone Community Bank upon which it may claim a perfected security interest against the assets sold. The secured claim of Cornerstone Community Bank against the book of business appears to be based upon its financing statement recorded on August 7, 2006, asserting a claim against "All Accounts".
>
> The Debtor believes that the claimed lien of Cornerstone Community Bank does not attach to the book of business which the Debtor believes is classified for Uniform Commercial Code purposes as "general intangibles" and not "accounts".
>
> Cohutta Banking Company is a bank with a business location in Hamilton County, Tennessee, which asserts a security interest against all furniture, equipment, general intangibles and inventory based upon a financing statement recorded on February 19, 2008, . . . .
>
> The Debtor believes that the financing statement filed by Cohutta Banking Company is a valid first lien against the proceeds of the sale of the book of business and attaches to the proceeds of sale and should be paid out of the sale proceeds as promptly as possible to avoid further costs to the estate.

Bankruptcy Complaint, ¶¶ 3-8.

The parties do not dispute that on June 23, 2003 Cornerstone filed a UCC Financing Statement Number 103-027023 with the Tennessee Secretary of State. The Financing Statement lists USIG as the debtor and states that it covers the following collateral: "All commissions on insurance premium accounts as listed in the attached Exhibit 'A'." [Case No. 1:10cv17, Court Doc. No. 1-3, p. 5]. It covered a maximum principal indebtedness of $1,000,000.00. *Id.* Exhibit A contains a list of carriers, types of insurance policies, policy numbers, expiration dates, premium amounts, and commissions for 17 different insurance policies. [Case No. 1:10cv17, Court Doc. No. 1-4, p. 7].

The underlying commercial security agreement pertaining to loan number 20003654 describes "collateral" in the following way:

> The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:
> ALL COMMISSIONS ON INSURANCE PREMIUM ACCOUNTS AS LISTED IN THE ATTACHED EXHIBIT "A"
> In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located . . .
> (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease or other disposition of any of the property described in this Collateral section . . .
> (E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

[Case No. 1:10cv17, Court Doc. No. 1-11, p. 35]. The definition portion of the security agreement stated the following definitions:

> Indebtedness. The word "indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. . . .
>
> Note. The word "Note" means the Note executed by U.S. INSURANCE GROUP, LLC in the principal amount of $1,000,000.00 dated June 19, 2003, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

*Id.* at p. 38. The President of USIG, Russell Huston signed the security agreement on USIG's behalf and an authorized representative of Cornerstone signed on the bank's behalf.

On June 28, 2004 Cornerstone filed a UCC Financing Statement Amendment Number 204-032151 that referenced the original UCC Financing Statement 103-027023 filed in June of 2003. The amendment relating to the change in collateral indicated an "X" in the box next to "restated collateral description" and described the collateral again as "all commissions on insurance premium accounts as listed in the attached Exhibit 'A'." [Case No. 1:10cv17, Court Doc. No. 1-3, p. 6]. The maximum principal indebtedness was listed as $0.00. *Id.* The attached Exhibit A listed the carrier, type of policy, policy number, expiration date, premium amounts, and commission for twenty-five different insurance policies. *Id.* at pp. 7-8. The President of USIG, Russell H. Huston, also signed the Exhibit A.

On August 8, 2005 Cornerstone filed another UCC Financing Amendment. [Case No. 1:10cv17, Court Doc. No. 1-3, p. 9]. This Amendment was number 205-025860 and referenced the UCC Financing Statement 103-027023. The section of the statement indicating the amendment or collateral change indicated that the collateral was "added." The description of the collateral stated, "all commissions on insurance premium accounts as listed in the attached exhibit 'A'" and further indicated that the indebtedness was increased from $1,000,000.00 to

$3,000,000.00.  *Id.*  Exhibit A attached to the amended financing statement contained the carrier, type of policy, policy number, expiration date, premium amounts, and commission for 108 policies.  Again, Mr. Huston signed the exhibit listing of policies as President of USIG.

On August 7, 2006 Cornerstone filed an additional UCC Financing Statement Amendment, which appears to be the financing statement at the core of the parties' dispute. [Case No. 1:10cv17, Court Doc. No. 1-4, p. 24].  This financing statement references financing statement number 103-027023 filed on June 23, 2003.  The description of the amendment or collateral change indicates that the amendment contains a "restated" collateral description.  *Id.* The entirety of the description states: "All Accounts; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing."  The indebtedness was increased from $3,000,000.00 to $4,400,000.00.  *Id.*  The amendment lists U.S. Insurance Group, LLC as the secured party and references loan numbers 20009009 and 20010593.  *Id.*

Cornerstone's Proof of Claim 39 contains a copy of a Commercial Security Agreement dated August 3, 2006 listing $1,400,000.00 as the principal amount and referencing loan number 20010593.  The description of "collateral" included "all accounts" and the further description of collateral mirrored the description in the 2003 security agreement as including:

> . . . (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section. . . .
> (E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

[Case No. 1:10cv17, Court Doc. No. 1-26, p. 4].  The security agreement also referred to loan

number 2009009 as cross-collateralization.  *Id.*

On January 28, 2008 Cornerstone filed a final UCC Financing Statement Amendment that indicated it was a continuation and referenced financing statement number 103027023 filed on June 23, 2003 and loan number 20009009.  [Case No. 1:10cv17, Court Doc. No. 1-4, p. 19].

On February 19, 2008 Cohutta filed its UCC Financing Statement relating to USIG. [Case No. 1:10cv17, Court Doc. No. 1-4, p. 27].  The statement indicates that the collateral covered by the statement is described in the attached exhibit A and further states that the maximum principal indebtedness for Tennessee tax recording purposes is $500,830.70.  *Id.* Exhibit A describes the covered collateral as:

> All equipment of the Debtor of every description used or useful in the conduct of the Debtor's business, now or hereafter existing or acquired, and all accessories, parts and equipment now or hereafter existing or acquired, and all accessories, parts and equipment now or hereafter affixed thereto or used in connection therewith.  All GENERAL INTANGIBLES now owned or hereafter acquired by the borrower, including but not limited to the borrower's patent, copyrights, and trademarks.  All monies or instruments pertaining to the collateral described above; all proceeds and products of the collateral described above as well as any replacements, accessions, substitutions and additions to the collateral.

> All inventory, of the debtor of every description, whether now or hereafter existing or acquired; all accounts and contract rights of Debtor, whether now or hereafter existing or acquired; all chattel paper and instrument, whether no[w] or hereafter existing or acquired, evidencing any obligation to Debtor for payment of goods sold or leased or services rendered; all interest of the Debtor in any goods the sale or lease of which shall have given or shall give rise to any of the foregoing; and all products and proceeds of any of the foregoing.  All GENERAL INTANGIBLES now owned or hereafter acquired by the borrower, including but not limited to the borrower's patent, copyrights, and trademarks/

[Case No. 1:10cv17, Court Doc. No. 1-4, p. 28].  Cornerstone entered into another Commercial Security Agreement with USIG on July 23, 2008 which referenced loan number 20009009 with a principal amount of $2,850,000.00. [Case No. 1:10cv27, Court Doc. No. 1-13, pp. 16-20, Case

No. 1:10cv17, Court Doc. No. 1-8, p. 26].

The bankruptcy court approved a sale of USIG's assets on May 19, 2009 to TrueNorth for a total of $1,650,000.00. [Case No. 1:10cv17, Court Doc. No. 1-21, p. 2]. Following the sale the bankruptcy court granted USIG's motion to convert the case into a Chapter 7 liquidation. *See* [Court Doc. No. 1-14, p. 2]. The court appointed Richard P. Jahn, Jr. as Trustee, and he replaced USIG as the plaintiff. *Id.*

In June of 2009, Cohutta filed a motion for partial summary judgment regarding its contention that it had priority on its secured interest in USIG's book of business. [Case No. 1:10cv17, Court Doc. No. 1-18; Case No. 1:10cv27, Court Doc. No. 1-8]. On August 25, 2009 Cornerstone filed its response to the motion for summary judgment in bankruptcy court and attached the affidavit of an expert on insurance valuation, who is also an executive vice president with an insurance group, Thomas Hicks Armor. [Case No. 1:10cv17, Court Doc. No. 1-11, p. 40]. Mr. Armor gave his opinion regarding the information supplied in the exhibits to Cornerstone's 2003, 2004 and 2005 financing statements:

> In the insurance industry, the information contained in the Exhibit A's summarizes the actual material assets of an insurance agency. In other words, the identities of an insurance agency's clients/insureds, the types of policies held by those clients/insureds, the policy numbers, the expiration dates, the annualized premium amounts, and the applicable annualized commissions expected or due is not just business information, but is, in fact absolutely critical to the business itself. More simply stated, an insurance agency is valued on the basis of its expirations, accounts, and commissions. Although it could function without this specific "list" as shown in the Exhibit A's, the value of its business is determined by this information and it cannot function without client information and pertinent policy types and numbers. Additionally, within the insurance industry, the term "account" means a client/insured, and not just an "account receivable."
>
> The information contained in the Exhibit A's is also the type of information that would be stored in and a part of USIG's records, paper or electronic, which memorialize and reflect the information. Without the existence and control over

such records, an insurance agency cannot function as a business.

[Case No. 1:10cv17, Court Doc. No. 1-11, p. 41, Affidavit of Thomas Hicks Armor ("Armor Aff."), ¶¶ 6-7].  Mr. Armor further opined that all of the assets transferred to TrueNorth following the sale of USIG's assets to TrueNorth were the same assets as those listed in Exhibit A of Cornerstone's 2005 UCC Financing Statement.  *Id.* at ¶ 9.

In denying Cohutta's motion for summary judgment and granting summary judgment for Cornerstone *sua sponte*, the bankruptcy court noted:

> Since the 2006 financing statement covered all commission accounts, it necessarily included the commission accounts listed in Exhibit A to the 2005 financing statement.  According to Mr. Armor's affidavit, those accounts existed from 2005 up through USIG's bankruptcy filing.  The 2006 financing statement instantly perfected the security interest in the related records since that security interest already existed under the 2003 security agreement.  The commission accounts covered by the 2005 financing statement and the related records were not collateral that the 2006 financing statement attempted to add without USIG's agreement.  The court can assume the 2006 financing statement was ineffective as to *added* accounts and related records until execution of the 2008 security agreement.  That is not a ground for holding the 2006 financing statement was ineffective with regard to collateral that was not added, specifically the commission accounts and related records sold in the bankruptcy case.  Thus, the 2006 financing statement continued perfection in those commission accounts and related records from the time it was filed in 2006 through the filing of USIG's bankruptcy case that resulted in their sale.

> In 2006 Cornerstone perfected its security interest in all of USIG's commission accounts and related records that were sold in the bankruptcy case.  This perfection occurred before Cohutta perfected its security interest in USIG's records as general intangibles.  This means that Cornerstone had the superior security interest in records that were sold as USIG's book of business, and it has the superior right to the proceeds of the sale.  In this situation, the court should grant summary judgment to Cornerstone even though it has not filed a motion.

[Case No. 1:10cv17, Court Doc. No. 1-14, Bankruptcy Opinion, pp. 12-13].

Cohutta appeals from this decision by the bankruptcy court.

## II.    Standard of Review

A district court reviews the findings of fact of a bankruptcy court for clear error, and the conclusions of law *de novo*.  *See In re Behlke*, 358 F.3d 429, 433 (6th Cir. 2004).  Federal Rule of Bankruptcy Procedure 8013 provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bank. P. 8013.

Where the bankruptcy court made its determination on a motion for summary judgment, the bankruptcy court's decision is purely a question of law.  Thus, the district court reviews the award of summary judgment *de novo*.  *See In re Batie*, 995 F.2d 85, 89 (6th Cir. 1993); *In re Cannon*, 277 F.3d 838 (6th Cir. 2002).

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable to bankruptcy adversary proceedings.  *See* Fed. R. Bank. P. 7056.  Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations.  The

nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

**IV.    Analysis**

The parties agree that Tennessee's version of the Uniform Commercial Code ("UCC") applies to the issues arising in this case. As explained by a Tennessee bankruptcy court: "'[t]he security agreement creates the security interest and is the basic contract between the parties with respect to the security interest.' Security interests are governed by the Uniform Commercial Code, as adopted in Tennessee." *In re Snelson*, 330 B.R. 643, 649 (Bankr. E.D. Tenn. 2005) (quoting *Lee v. Loving Homes, Inc. (In re Loving Homes, Inc.)*, 238 B.R. 388, 398 (Bankr. E.D. Tenn. 1999)). A security interest is "an interest in personal property or fixtures that secures payment or performance of an obligation." Tenn. Code Ann. § 47-1-201(35) (2008).

The UCC explains that, with listed exceptions not relevant here,

a security interest is enforceable against the debtor and third parties with respect
to the collateral only if:
(1) value has been given;
(2) the debtor has rights in the collateral or the power to transfer rights in the
collateral to a secured party; and
(3) one (1) of the following conditions is met:
(A) the debtor has authenticated a security agreement that provides a description
of the collateral  . . . .

Tenn. Code Ann. § 47-9-203(b). Except for exceptions not relevant here, "a financing statement

-11-

must be filed to perfect all security interests . . ." Tenn. Code Ann. § 47-9-310(a).  The UCC

provides general rules governing priority of secured interests:

> (1) Conflicting perfected security interests and agricultural liens rank according to
> priority in time of filing or perfection.  Priority dates from the earlier of the time a
> filing covering the collateral is first made or the security interest . . . is first
> perfected, if there is no period thereafter when there is neither filing nor
> perfection.
> (2) A perfected security interest . . . has priority over a conflicting unperfected
> security interest . . . .

Tenn. Code Ann. § 47-9-322(a)(1)-(2).  A financing statement will be sufficient only if it:

> (1) provides the name of the debtor;
> (2) provides the name of the secured party or a representative of the secured
> party; and
> (3) indicates the collateral covered by the financing statement.

Tenn. Code Ann. § 47-9-502(a).  The purpose of the notice is to indicate "that a person may have

a security interest in the collateral indicated.  Further inquiry from the parties concerned will be

necessary to disclose the complete state of affairs."  Tenn. Code Ann. § 47-9-502, Comment 2.

Further, "[a] financing statement sufficiently indicates the collateral that it covers if the

financing statement provides: (1) a description of the collateral pursuant to § 47-9-108 . . ."

Tenn. Code Ann. § 47-9-504(1).  Comment 2 to this provision explains that "[a] financing

statement sufficiently indicates collateral claimed to be covered by a financing statement if it

satisfies the purpose of conditioning perfection on the filing of a financing statement, i.e., if it

provides notice that a person may have a security interest in the collateral claimed."  Tenn. Code

Ann. § 47-9-504, Comment 2.

The provision referenced in Tenn. Code Ann. § 47-9-504, Tenn. Code Ann. § 47-9-108,

provides guidance regarding the sufficiency of a description relating to collateral in a UCC

Financing Statement:

(a) Sufficiency of Description.  Except as otherwise provided in subsections (c), (d), (e) and (f), a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described.

(b) Examples of reasonable identification.  Except as otherwise provided in subsection (d), a description of collateral reasonably identifies the collateral if it identified the collateral by:

(1) specific listing;

(2) category;

(3) except as otherwise provided in subsection (e), a type of collateral defined in the Uniform Commercial Code;

(4) quantity;

(5) computational or allocational formula or procedure; or

(6) except as otherwise provided in subsection (c), any other method, if the identity of the collateral is objectively determinable.

(c) Supergeneric description not sufficient.  A description of collateral as "all the debtor's assets" or "all the debtor's personal property" or using words of similar import does not reasonably identify the collateral.

Tenn. Code Ann. § 47-9-108.  The Official Comments clarify that:

> [t]he test of sufficiency of a description under this section, as under former Section 9-110, is that the description do the job assigned to it: make possible the identification of the collateral described.  This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called "serial number" test).

Tenn. Code Ann. § 47-9-108, Comment 2.  Tennessee courts have explained:

> Minor mistakes in financing statements are not fatal because . . . [Former § 47-9-402, now § 47-9-504] was intended to provide merely a system of notice filing . . . . Thus, even though there may be errors or deficiencies in descriptions, addresses, names, and even signatures, such errors will not destroy the effectiveness of a financing statement so long as they do not frustrate the underlying purpose of the filing requirements in affording notice to creditors of the possible existence of security interests.

*In re Snelson*, 330 B.R. at 652 (quoting *C&J Leasing Corp. v. Waldschmidt (In re Goolsby)*, 284

B.R. 638, 641 (Bankr. M.D. Tenn. 2002)).

Cohutta's position is that Cornerstone's UCC Financing Statements, specifically the 2006

Financing Statement, listing "all accounts whether any of the foregoing is owned now or

acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing" as the collateral was not sufficient to create a priority interest in USIG's "book of business," meaning information pertaining to client insurance policies, such as expiration dates and renewals.  [Case No. 1:10cv17, Court Doc. No. 1-4, p. 24].  Cornerstone argues that the description of collateral in the 2006 Financing Statement was sufficient to cover all of USIG's accounts, which it argues is defined very broadly under the revised UCC Article 9 and includes USIG's "book of business."

The current version of the UCC, as revised in 2001, defines account, except as in "account for," in relevant part as: "a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, . . . ."  Tenn. Code Ann. § 47-9-102(a)(2) (2001).  The prior version of the statute defined "account" as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance."  Tenn. Code Ann. § 57-9-106 (2000).

A "general intangible" is currently defined as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction.  The term includes payment intangibles and software." Tenn. Code Ann. § 47-9-102(a)(42) (2001).  A "record" is defined as "information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form."  Tenn. Code Ann. § 47-9-102(a)(69).

The Comments to the revised version of Article 9's definitions indicates that "[t]he definition of 'account' has been expanded and reformulated. It is no longer limited to rights to payment relating to goods or services. Many categories of rights to payment that were classified as general intangibles under former Article 9 are accounts under this Article." Tenn. Code Ann. § 47-9-102, Comment 5a. The Official Comments further clarify that "'[g]eneral intangible'" is the residual category of personal property, including things in action, that is not included in the other defined types of collateral. Examples are various categories of intellectual property and the right to payment of a loan of funds that is not evidenced by chattel paper or an instrument." Tenn. Code Ann. § 47-9-102, Comment 5d.

The Comments also elaborate on the meaning of the term "record." They explain:

A "record" need not be permanent or indestructible, but the term does not include any oral or other communication that is not stored or preserved by any means. The information must be stored on paper or in some other medium. Information that has not been retained other than through human memory does not qualify as a record. Examples of current technologies commercially used to communicate or store information include, but are not limited to, magnetic media, optical discs, digital voice messaging systems, electronic mail, audio tapes, and photographic media, as well as paper. "Record" *is an inclusive term that includes all of these methods of storing or communicating information.* Any "writing" is a record. A record may be authenticated. . . A record may be created without the knowledge or intent of a particular person.

Tenn. Code Ann. § 47-9-102, Comment 9 (emphasis added).

Cohutta argues that USIG's "book of business" is classified as a "general intangible" and not an "account" even under the revised definitions in UCC's Article 9 provisions. It further contends that its 2008 UCC Financing Statement has priority over Cornerstone's 2006 Financing Statement because Cornerstone's Financing Statements did create a lien on USIG's "book of business" or USIG's information pertaining to client policies, expirations, renewals, policy

premiums, and commissions. Cohutta contends that Cornerstone's 2006 UCC Financing Statement restated the description of the collateral identified and by listing the collateral as all accounts and all related records made the descriptions of collateral in the 2003, 2004, and 2005 Financing Statements irrelevant.

Cohutta agrees that "commissions" are included as "accounts" because they constitute a right to payment and are therefore within the definition of account. In contrast, Cohutta argues, a customer list, being more in the nature of goodwill, is not an entitlement to a stream of income and does not generate proceeds; therefore, it does not fall within the definition of "account" for purposes of Tenn. Code Ann. 47-9-102.

A large portion of the cases relied upon by Cohutta regarding the meaning of the definition of account are based on the definition of account as it existed prior to the 2001 revised definition. *See e.g., Commercial Nat'l Bank v. Seubert & Assoc., Inc.*, 807 A.2d 297, 303 (Pa. Super. Ct. 2002) (asserting that "[p]reliminarily, we note that the cited sections are in the recently revised UCC and are not retroactive prior to July 2001 and are therefore inapplicable to the case at hand"); *In re Professional Ins. Management*, 130 F.3d 1122 (3d Cir. 1997) (pre-revision case); *In re Roy A. Dart Ins. Agency, Inc.*, 5 B.R. 207 (Bankr. D. Mass. 1980) (same); *In re Davies Ins. Serv., Inc.*, 33 B.R. 252 (Bankr. W.D. Pa. 1983) (same); *In re Levitz Ins. Agency, Inc.*, 152 B.R. 693 (Bankr. D. Mass. 1992) (same).

It is true that in several pre-revision cases courts identified insurance information such as "expirations" as a "general intangible" for UCC purposes. For example, in *In re Professional Ins. Management* the court noted that "collateral, in the agency agreement between the two parties, is the expirations, also known as the debtor's book of business. Expirations have been

determined to be best categorized for UCC purposes as 'general intangibles,' which may be perfected only by filing, not by possession." 130 F.3d at 1128 (relying on *In re Roy A. Dart Ins. Agency, Inc.*, 5 B.R. at 214-16).

In *In re Roy A. Dart Ins. Agency, Inc.* the bankruptcy court, relying on an insurance treatise, determined that the term "expirations" included "records of an insurance agency by which the agent has available a copy of the policy issued or records containing the date of the policy, name of the insured, date of expiration, amount of insurance, premiums, property covered, and terms of insurance . . . Such information is of vital assistance to the agency in carrying on the insurance business and is recognized as a valuable asset in the nature of goodwill." 5 B.R. at 209 (quoting 4 Couch on Insurance 2d § 26:428 at 407 (1960)). In determining that the "expirations" or "goodwill" of the insurance company was properly classified as a "general intangible," the court relied on the Official Comment of the prior version of the UCC:

> The term "general intangibles" was designed by the drafters of the Code as a catch-all category. The Official Comment to section 9-106 sheds further light on this category.
> The term "general intangibles" brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance. . . .

*Id.* at 215 (quoting U.C.C. 9-106, Official Comment).

Notably, the revised Official Comment does not mention that "general intangibles" include "goodwill," but instead it notes that the definition of "account" has been expanded to include collateral that was considered "general intangibles" under the prior version of the Code. *See* Tenn. Code Ann. § 47-9-102, Comments 5a, 5d (2001). As one court has noted "Tennessee

courts generally give 'substantial deference' to the Official Comments. 'While not binding, [they] are very persuasive in interpreting the statute to which they apply. The comments give some insight into the intent of the overall scheme of the statute as contemplated by the General Assembly in adopting the language of the Statute.'" *In re Stetson & Assocs., Inc.*, 330 B.R. 613, 621 (Bankr. E. D. Tenn. 2005) (quoting *LeTellier v. LeTellier*, 40 S.W.3d 490, 493 n. 2 (Tenn. Sup. Ct. 2001) and *Smith v. First Union Nat'l Bank*, 958 S.W.2d 113, 116 (Tenn. Ct. App. 1997)).

Further, the court in *In re Roy A. Dart Ins. Agency, Inc*. emphasized that an insurance company's "expirations" include the company's *records*, an item specifically listed on Cornerstone's 2006 UCC Financing Statement. *See* 5 B.R. at 209. A more recent case, decided after the UCC revisions, also emphasizes that the meaning of an insurance company's "book of business" includes a company's records. *See In re Williams*, 354 B.R. 604 (N.D.N.Y. 2006). There the bankruptcy court noted that:

> In this case, we are concerned with the value of the Agency, including the insurance renewals or "expirations" or what has been referred to as the "book of business." As noted by one court,
> [t]he "book of business" also known as "expirations" or "renewals," has a definite and well recognized meaning in the insurance industry. "[I]t embodies the *records* of an insurance agency . . . . This information enables the agent to contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements."

*Id.* at 608 (emphasis added) (quoting *Texas Truck Ins. Agency, Inc. v. Cure (In re Dunham)*, 110 F.3d 286, 287 (5th Cir. 1997), citing *Matter of the Estate of (Erastus II) Corning*, 488 N.Y.S.2d 477 (N.Y. App.Div. 1985)).

In this case Cornerstone's 2006 Financing Statement clearly includes accounts, which

Cohutta admits includes commissions, as well as all *records* relating to those accounts. As confirmed by the court in *In re Williams* a "book of business" in the insurance industry includes the "records" of the agency pertaining to insurance policies. Cohutta does not attempt to argue that the details pertaining to USIG's "book of business" are not written in a tangible medium, such as on paper or in electronic files. Thus, the information pertaining to expirations and renewals is included in the term "records" in Cornerstone's 2006 Financing Statement. In addition, Cornerstone's expert, Thomas Armor, described how the term "account" is used in the insurance industry to mean both an amount of money that is due and payable, as well as information pertaining to a client's insurance needs, policies, and expiration information. *See* Armor Aff. ¶ 6.

Mr. Armor further asserted that all of the accounts listed in the 2005 Exhibit A were the accounts that were sold to TrueNorth. Armor Aff., ¶¶ 8-9. There is nothing in the record demonstrating that Cohutta rebutted Mr. Armor's statement with its own expert testimony. Thus, the 2006 Financing Statement, although indicating that it covered future accounts, only covered those accounts which were listed on the 2005 Financing Statement's Exhibit A. Further, Cornerstone's description of all accounts and all records pertaining to such accounts, which would include records pertaining to commissions was sufficient to satisfy the lenient description standards outlined in Tenn. Code Ann. § 47-9-108 and provide notice to any other creditors of Cornerstone's security interest in USIG's "book of business." This is the purpose of the financing statement – to warn other creditors that they should examine the prior perfected security interests of those creditors before determining whether to make a particular loan to a debtor. *See* Tenn. Code Ann. § 47-9-502, Comment 2. Cornerstone's 2006 Financing Statement

was sufficient to fulfill that purpose.  Therefore, the court concludes that the bankruptcy court did not err in granting summary judgment *sua sponte* to Cornerstone regarding the priority of its perfected security interest in USIG's book of business.  *See In re Century Offshore Management Corp.*, 119 F.3d 409, 412 (6th Cir. 1997) (asserting that summary judgment award to non-movant may be appropriate where issues are fully briefed and no material facts are at issue).

**IV.** **Conclusion**

As stated *supra*, the court concludes that the bankruptcy court did not err as a matter of law in determining the Cornerstone had the prior perfected security interest in USIG's book of business.  The court finds that Cornerstone's 2006 UCC Financing Statement's description of collateral was sufficient to put Cohutta on notice of the superior security interest of Cornerstone in the book of business by use of the terms all accounts and related records.  The bankruptcy court's decision will be **AFFIRMED**.

A separate order will enter.


_____*/s/ R. Allan Edgar*_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE